**No. 16-30213**

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STEVEN DOUGLAS ROCKETT

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Oregon
No. 3:13-cr-00557-SI
Hon. Michael H. Simon

_____

## APPELLANT'S OPENING BRIEF

_____

Christopher J. Schatz
Federal Public Defender - District of Oregon
101 SW Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123
chris_schatz@fd.org

*Attorney for Defendant-Appellant*
*Steven Douglas Rockett*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................v

JURISDICTIONAL STATEMENT ...........................................................1

ISSUE(S) PRESENTED ............................................................................1

STATEMENT OF THE CASE....................................................................2

    I.    Nature Of The Case..................................................................2

    II.    Procedural History....................................................................2

    III.    Statement Of Facts. ..................................................................5

        A.    Forest Grove Investigation...........................................5

        B.    N.S., the Washington County Sheriff's Investigation, and Mr. Rockett's Prosecution in Washington County. .........................10

        C.    Computer And Digital Evidence Analysis.................14

        D.    FBI Investigation.......................................................17

SUMMARY OF THE ARGUMENT .....................................................22

ARGUMENT ..........................................................................................24

    IV.    Mr. Rockett's Convictions For Production Of Child Pornography, In Violation Of 18 U.S.C. § 2251(a), Are Not Based On Evidence Sufficient To Support A Determination Of Guilt Beyond A Reasonable Doubt...................................................................24

        A.    Standard Of Review ...................................................25

        B.    The *Dost* Factors – And In Particular Factor Six – Introduce A Subjective Interpretation Of The Term "Lascivious Exhibition" That Is Not Supported By §§ 2251 And 2256(2)(A). ..............26

1.     A plain reading of § 2251(a) limits its application to depictions involving actual sexual conduct. ...................30

2.     Section 2256(2)(A)(v)'s "Lascivious Exhibition" text describes a sex act; this provisions does not call for inferences as to what was in the mind of a photographer photographing a nude minor. ..........................................35

3.     Judge Simon's use of the *Dost* factors introduced vagueness into the determination of whether Mr. Rockett violated § 2251(a). ..........................................................38

C.     The Conjoining Of *Dost* Factor Six And The Criteria Requisite To Proof Of The § 2251(a) Charges Rendered Those Charges Constitutionally Vague In Violation Of Mr. Rockett's Due Process Entitlements To Fair Notice And Freedom From Arbitrary Enforcement Of The Law. ........................................42

D.     The Doctrine Of Constitutional Avoidance Mandates An Objective Interpretation Of The "Lascivious Exhibition" Criterion. ....................................................................46

V.     Mr. Rockett's Convictions Under Counts 4 And 5 Should Be Reversed Because There Was Insufficient Evidence Of A Substantial Step Toward Committing The Crime Of Producing Child Pornography. ........................................................................48

A.     Standard of Review. ..................................................48

B.     The Evidence Is Insufficient To Establish That Mr. Rockett Attempted To Create Photographic Depictions Of Minors Engaged In Sexually Explicit Conduct. .....................................48

VI.     Mr. Rockett's Convictions For Producing Child Pornography Outside The United States (Count 1) And For Possession Of Child Pornography (Count 9) Should Be Vacated Due To The Risk Of Prejudicial Spill-Over Stemming From The Evidence Admitted In Support Of Counts 4, 5, 7, And 8. ........................................52

A.     Standard Of Review. ..................................................52

iii

B.      The Composition Of Government Exhibit 10 Created A Risk Of Prejudicial Spill-Over. ..............................................................52

CONCLUSION ........................................................................................54

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tobacco Co. v. Patterson*, 456 U.S. 63 (1982) ................................................32

*Barnhart v. Thomas*, 540 U.S. 20 (2003)...................................................35

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................44

*Doe v. Chamberlin*, 299 F.3d 192 (3d Cir. 2002)............................................. 41, 42

*Garcia v. United States*, 469 U.S. 70 (1984) ...........................................33

*Giaccio v. Pennsylvania*, 382 U.S. 399 (1966)........................................43

*In re Winship*, 397 U.S. 358 (1970) ..........................................................24

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................25

*Kolender v. Lawson*, 461 U.S. 352 (1983)................................................43

*Liparota v. United States*, 471 U.S. 419 (1985) .....................................46

*N. Sec. Co. v. United States,* 193 U.S. 197 (1904) ..................................22

*New York v. Ferber*, 458 U.S. 747 (1982) ....................................... 30, 35

*Osborne v. Ohio*, 495 U.S. 103 (1990) ....................................................45

*Perrin v. United States*, 444 U.S. 37 (1979) ...........................................32

*Richards v. United States*, 369 U.S. 1 (1962) .........................................32

*Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.,* No. 2:12-cv-546, 2013 WL 12131747 (E.D. Va. Aug. 23, 2013)............................................33

*Turner v. Nelson-Dykes*, 461 F. Supp. 892, 894 (N.D. Tex. 1978) ........................22

*United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366 (1909)..........................................................................................47

*United States v. Amirault*, 173 F.3d 28 (1st Cir. 1999) ................................... 45, 46

*United States v. Buffington*, 815 F.2d 1292 (9th Cir. 1987) ...................49

*United States v. Carroll*, 227 F.3d 486 (5th Cir. 2000) ..........................36

*United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986)..........................................
.............................................. 23, 26, 27, 28, 29, 30, 38, 39, 41, 42, 44, 45, 47

*United States v. Freeman*, 808 F.2d 1290 (8th Cir. 1987).......................................43

*United States v. Goetzke*, 494 F.3d 1231 (9th Cir. 2007) .......................................49

*United States v. Gonzalez-Aparicio,* 663 F.3d 419 (9th Cir. 2011).......................26

*United States v. Hill*, 322 F. Supp. 2d 1081 (C.D. Cal. 2004)................................39

*United States v. Horn*, 187 F.3d 781 (8th Cir. 1999)...............................................37

*United States v. Hudson & Goodwin*, 11 U.S. 32 (1812) .......................................46

*United States v. Johnson*, 639 F.3d 433 (8th Cir. 2011)..........................................31

*United States v. Johnson*, No. 2:10-cr-71, 2011 WL 2446567 (M.D. Fla. June 15, 2011) ........................................................................................................................38

*United States v. Kemmerling*, 285 F.3d 644, 645-46 (8th Cir. 2002).....................45

*United States v. Knox*, 32 F.3d 733 (3d Cir. 1994)......................................32, 36, 37

*United States v. McDowell,* 705 F.2d 426 (11th Cir. 1983) ....................................49

*United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000) ..........................................25

*United States v. Nemuras*, 567 F. Supp. 87 (D. Md. 1983) ....................................28

*United States v. O'Brien*, 391 U.S. 367 (1968) ......................................................33

*United States v. Olano*, 507 U.S. 725 (1993) .........................................................52

*United States v. Overton*, 573 F.3d 679 (9th Cir. 2009) ...................................25, 38

*United States v. Oviedo*, 525 F.2d 881 (5th Cir. 1976) ...........................................51

*United States v. Price*, 775 F.3d 828 (7th Cir. 2014) .............................................35

*United States v. Reese*, 92 U.S. 214 (1876) ...........................................................46

*United States v. Ruggierio*, 791 F.3d 1281 (11th Cir. 2015)..................................43

*United States v. Steen*, 634 F.3d 822 (5th Cir. 2011) ..........................35, 38, 41, 42

*United States v. Stoddard*, 150 F.3d 1140 (9th Cir. 1998) .....................................48

*United States v. Villard*, 885 F.2d 117 (3d Cir. 1989).............................................47

*United States v. Wiegand*, 812 F.3d 1239 (9th Cir. 1987)........................ 26, 29, 30

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................32

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)...............................35

*Zant v. Stephens*, 462 U.S. 862 (1983) ....................................................53

*Zuber v. Allen*, 396 U.S. 168 (1969) ........................................................33

## Constitutions

U.S. Const. art I., § 1 .............................................................................46

## Statutes

18 U.S.C. § 1801(a) ..............................................................................38

18 U.S.C. § 2251 ................................................................. 29, 30, 31, 42, 43

18 U.S.C. § 2251(a) ...... 23, 24, 26, 27, 30, 31, 33, 34, 35, 36, 38, 41, 42, 46, 48, 52

18 U.S.C. § 2251(c) ........................................................................ 26, 52

18 U.S.C. § 2251(e) ........................................................................ 48, 52

18 U.S.C. § 2252 ....................................................................................29

18 U.S.C. § 2252A(a)(5)(B) .............................................................. 26, 52

18 U.S.C. § 2252A(b)(2)....................................................................52

18 U.S.C. § 2253 .....................................................................................2

18 U.S.C. § 2255(2)(E) .................................................................... 27, 29

18 U.S.C. § 2256(2)(A)..................................................... 30, 32, 34, 35, 42

18 U.S.C. §§ 2256(2)(A)(i)-(v).........................................................32

18 U.S.C. § 2256(2)(A)(v) ........................................ 24, 35, 36, 43, 44, 53

18 U.S.C. § 2256(8) ............................................................................52

18 U.S.C. § 3231 ..................................................................................1

vii

Child Protection Act of 1984, Pub. L. No. 98–292, § 5, 98 Stat. 204 (1984) .........34

**Rules**

Fed. R. Crim. P. 29........................................................ 4, 23, 24, 25, 26, 39, 40, 41

Fed. R. Crim. P. 52(b) ...............................................................................52

**Legislative Materials**

S. Rep. No. 95-601 (1977) (Conf. Rep.)...................................................33

S. Rep. No. 98-169 (1983) ......................................................................34

**Books**

*Black's Law Dictionary* (Bryan A. Garner, ed., 10th ed. 2014) ...................... 33, 35

Paul H. Robinson, 1 *Criminal Law Defenses* (1984)................................................42

**Periodicals**

Amy Adler, *Inverting The First Amendment*, 149 U. Pa. L. Rev. 933 (2001) . 23, 39

Amy Adler, *The "Dost Test" in Child Pornography Law: "Trial by Rorschach Test", in Refining Child Pornography Law: Crime, Language and Social Consequences* 81 (Carissa Byrne Hessick ed., 2016) ........................... 30, 37

Robert Batey, *Vagueness and the Construction of Criminal Statutes – Balancing Acts*, 5 Va. J. Soc. Pol'y & L. 1 (1997) ........................................................43

# JURISDICTIONAL STATEMENT

This appeal is from a final judgment in a criminal case. Jurisdiction attached under 18 U.S.C. § 3231. On September 13, 2016, following Mr. Rockett's conviction, the district court entered judgment imposing a sentence of 720 months' imprisonment and lifetime supervision. CR 151; ER 1.[1]

The Notice of Appeal was filed on September 13, 2016. CR 153; ER 57. A Final Order of Forfeiture was filed on November 29, 2016. CR 160. Mr. Rockett is incarcerated at USP Tucson. His projected release date is February 5, 2066.

# STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

# ISSUE(S) PRESENTED

1. Did Judge Simon err by denying Mr. Rockett's Rule 29 motion?

2. Is the evidence sufficient to sustain Mr. Rockett's convictions as to Counts 4, 5, 7, and 8?

3. Did a spill-over of improperly admitted evidence occur that requires retrial of Counts 1 and 9?

---

[1] Page references proceeded by "CR" refer to the numbered entries in the District Court Record. Page references proceeded by "ER" refer to the Excerpts of Record. References to the Reporter's Transcript are designated by "RT," followed by the page number(s) where the reference is found.

# STATEMENT OF THE CASE

## I.     NATURE OF THE CASE.

This is a direct appeal from a judgment of conviction based on a jury finding Mr. Rockett guilty of one count of Producing Child Pornography Outside the United States, one count of Engaging in Illicit Sexual Conduct with a Minor in a Foreign Place, five counts of Producing or Attempting to Produce Child Pornography, and one count of Possession of Child Pornography.

## II.     PROCEDURAL HISTORY.

On October 29, 2013, following the filing of a Criminal Complaint, Mr. Rockett made his first appearance. CR 4. AFPD Patrick Ehlers was appointed to represent him. Mr. Rockett was detained.

On November 20, 2013, a five-count Indictment was returned against Mr. Rockett charging him with four counts of Producing Child Pornography and one count of Possession of Child Pornography. CR 7; ER 262-65. The Indictment also contained a forfeiture allegation pursuant to 18 U.S.C. § 2253 pertaining to personal computers and other electronic equipment that had purportedly been used to commit the offenses. *Id.* The case was assigned to the Hon. Michael B. Simon. CR 11.

Mr. Rockett was arraigned on the Indictment on November 27, 2013. He entered pleas of not guilty. CR 12.

On December 19, 2013, Mr. Rockett gave notice that attorneys Andrew D. Coit and Tom C. Borton would represent him. CR 14. On January 7, 2014, a writ of habeas corpus ad prosequendum issued as to Mr. Rockett commanding his appearance at a bail forfeiture hearing in Washington County Circuit Court where he faced state child sex abuse charges. CR 18.

On December 10, 2014, a Superseding Indictment was returned against Mr. Rockett that added additional charges – one count of Producing Child Pornography Outside the United States, three counts of International Travel with the Intent to Engage in Sex with a Minor, and two counts of International Travel and Engaging in Illicit Sexual Conduct with a Minor. CR 34; ER 256-61. The Superseding Indictment also contained two forfeiture allegations pertaining to property used in the commission of the child pornography production and International Travel offenses. *Id.* Mr. Rockett was arraigned on the Superseding Indictment on December 15, 2014, and entered pleas of not guilty. CR 38.

On December 16, 2015, a nine-count Second Superseding Indictment was returned against Mr. Rockett, which dropped the International Travel with the Intent to Engage in Sex with a Minor charges and one count of Producing Child Pornography with respect to victim N.S. in 2011, while adding two counts of Producing Child Pornography with respect to two newly identified victims. CR 57;

3

ER 250-55.[2] The two forfeiture allegations remained. *Id.* Mr. Rockett entered pleas of not guilty to the Second Superseding Indictment on January 13, 2016. CR 63. Trial in Mr. Rockett's case was scheduled for May 15, 2016. *Id.*

*In limine* motion proceedings and a pretrial conference were conducted on May 11, 2016. CR 116. A formal order memorializing Judge Simon's decisions with respect to the *in limine* motion proceedings issued May 14, 2016. CR 121; ER 46-56.

Trial proceedings commenced May 16, 2016, and continued day to day thereafter to May 24, 2016. On May 24, following the close of the evidence, attorney Coit made an oral motion pursuant to Federal Rule of Criminal Procedure 29 as to Counts 4, 5, 7, 8, and 9. RT 1092-99. This motion was denied. RT 1099. Closing argument was held and the jury was instructed. The jury retired to deliberate and then returned with a finding of guilty as to counts 1, 2, 4, 5, 6, 7, 8, and 9. RT 1256-58; ER 8-9.[3]

---

[2] The Second Superseding Indictment identifies and links certain counts with specific victims as follows: Count 4, M.G.; Count 5, H.J; Count 6, N.S.; Count 7, D.S.; Count 8, B.S. RT 312-14; ER 251-53.

[3] Count 3 had previously been withdrawn. RT 863-64.

4

Mr. Rockett appeared for sentencing on September 8, 2016. CR 149. He received sentences totaling 720 months' imprisonment. ER 1. Judge Simon imposed a supervised release term of life and a special assessment totaling $800.[4]

## III. STATEMENT OF FACTS.

### A. Forest Grove Investigation.

In late February 2013, Christine Jumoa-as Rockett, Mr. Rockett's former spouse, spoke with Forest Grove Police Detective Matt Smith. RT 93. Smith spoke with Jumoa-as following his receipt of a D.H.S. report containing allegations of child abuse made by Jumoa-as involving Mr. Rockett. RT 94, 115-16. At the time he received the report, Smith was aware that Jumoa-as and Mr. Rockett had been engaged in contentious child custody proceedings. *Id.*[5]

On March 4, 2013, Smith interviewed Jumoa-as at St. Anthony's Legal Aid Clinic in Hillsboro, Oregon. RT 117. During the course of this interview, Smith displayed Government Exhibit 1, a digital image that he had obtained from Steven

---

[4] On October 5, 2016, Judge Simon entered a formal order relieving attorneys Coit, Borton, and Chelsea B. Payment, and directing the Federal Public Defender to appoint counsel to represent Mr. Rockett on appeal. CR 154. Attorney Coit remained attorney of record in the district court with respect to proceedings pertaining to restitution. CR 183.

[5] Mr. Rockett and Christine Jumoa-as Rockett were divorced in 2011. RT 823.

Rockett's Flickr account, to Jumoa-as. RT 95-96; ER 66.[6] Jumoa-as identified several of the individuals depicted in the photograph.[7]

Several weeks later, Jumoa-as contacted Smith to report that her sister, Charis, who still lived in the Philippines, had been in contact with Mr. Rockett via Facebook. RT 98. She recounted additional concerns about Mr. Rockett's Facebook communications with Charis. Jumoa-as gave Smith her sister's Facebook login information. RT 98. Smith accessed the account and read communications in which Mr. Rockett was requesting Charis to provide him with nude images of a child. RT 98-99.

Smith sought and obtained a state search warrant for Mr. Rockett's Facebook records, as well as the Facebook records for N.S., C.R., and J.R.. RT 99-100.[8] Smith eventually reviewed approximately 30,000 pages of Facebook profile

---

[6] According to Smith, Mr. Rockett's Flickr and Facebook accounts contained a huge volume of non-contraband photographs. RT 117.

[7] In this photograph, five children are depicted who appear to be sitting on a bed in a room. RT 97. Jumoa-as identified several of the children as known to her, an unknown neighbor child, and J.R.. *Id*. She also identified the location of the photograph as being a room at the Golden Peak Hotel, Cebu City, Philippines. RT 97.

[8] N.S. is the minor named as the victim of the criminal activity charged against Mr. Rockett in Count 6 of the Second Superseding Indictment. In the course of his investigation, Smith interviewed J.R. and C.R., Mr. Rockett's sons, as well as twin brothers D.S. and B.S., who were friends with J.R. and C.R.. RT 118-19. Initially, none of the children mentioned anything out of the ordinary concerning Mr. Rockett. RT 119. After interviewing D.S. and B.S., Smith had them evaluated for

account information. RT 101.[9] The Facebook data contained photographs of N.S., as well as other photographs of children that appeared to Smith as having been taken overseas. RT 103-04. Smith observed an instant message communication from Mr. Rockett to N.S. requesting that she provide him with nude images of her body. RT 104-05.[10]

Smith observed a Facebook conversation between Mr. Rockett and an individual in the Philippines identified as M.G., Smith reviewed M.G.'s Facebook information. RT 106; Government Exhibit 3; ER 78-83. On the basis of a

---

child sexual abuse at CARES Northwest. RT 142. D.S. and B.S. denied being the victims of abuse. RT 144-45.

[9] With respect to all Facebook communications attributed to Mr. Rockett, other than the Facebook texts themselves, no additional evidence was submitted by the government to corroborate that Mr. Rockett was actually the writer, as opposed to someone else using his account. During trial, testimony was received that a number of people had access to Mr. Rockett's computers including his brother, and his two sons. RT 757-58; 787-88. J.R. testified that he had used one of the computers, but that he never utilized any of the encryption applications, such as Stealth Encryptor, that were found installed after the computers were seized. RT 784. The Facebook communications, purportedly engaged in by Mr. Rockett, are set forth in full in the Excerpts of Record – Government Exhibit No. 2 (N.S.) at ER 67-77; Government Exhibit 3 (M.G.) at ER 78-83; Government Exhibit 4 (Charis Jumoa-as) at ER 84-124; and Government Exhibit 7 (N.S.) at ER 146-156.

[10] *See* Government Exhibit 2; ER 67-77; RT 105. Smith found sexually suggestive photographs of Christine Jumoa-as on a website hosted in Russia and identified as www.imgsrc.ru. RT 120. On this website, Smith also found usernames "StevenRockett" and "SRockett," which he believed were associated with Mr. Rockett. RT 121, 123-24.

photograph of M.G., it appeared to Smith that M.G. was between 6 and 9 years of age at the time the photograph was posted to her profile page. RT 106.[11]

Smith also reviewed additional Facebook conversations between Mr. Rockett and Charis Jumoa-as.[12] In a conversation that took place on April 27, 2013, Mr. Rockett wrote that he would send Charis Jumoa-as care packages if she would take nude photographs of her daughter H.J. and M.G. RT 111. Mr. Rockett also wrote, "Just make sure to send some special pictures of [H.J.] and [M.G.] – both front and back – full body." RT 112.

On May 1, 2013, Mr. Rockett wrote to Charis Jumoa-as that he "would like to have more private pictures of [H.J.] and [M.G.]." RT 111. When Charis Jumoa-as asked "what kind," Mr. Rockett responded, "No clothes would like to see how

---

[11] Mr. Rockett travelled to the Philippines on a number of occasions. According to FBI Staff Operations Specialist Abigail Schmidt, who examined Mr. Rockett's passport, Mr. Rockett travelled to and was in the Philippines from January 11, 2000, through January 23, 2000; from August 19, 2000, through August 25, 2000; from October 14, 2000, through October 22, 2000; from July 11, 2002, through July 24, 2000, from December 29, 2003, through January 17, 2004 (along with Christine Jumoa-as Rockett and their two sons); from September 2, 2005, through October 1, 2005 (again with family members); from October 12, 2007, through October 28, 2007; from January 28, 2010, through January 31, 2010; from February 8, 2010, through February 16, 2010; and from January 15, 2013, through January 29, 2013. RT 972-78; *see also* Gov't Ex. 29, ER 208.

[12] These Facebook messages are contained in Government Exhibit 4. ER 84-124. Smith admitted he never spoke with Charis Jumoa-as, and AUSA Sussman advised Judge Simon that she was not being called by the government as a witness. RT 108. Although he admitted Government Exhibit 4, Judge Simon gave a limiting instruction to the jury. RT 109.

healthy they are and be able to see how their bodies change as they get older." RT 111. On May 8, 2013, Mr. Rockett further requested that Charis Jumoa-as should "make sure it is a lot of pictures and shows front and back and no shy. And no worry, only I will ever see the pictures." RT 114.[13]

To encourage the girls to pose for nude photos. Mr. Rockett suggested to Charis Jumoa-as, "Just have them model swim suits and take pictures and then have them take off swim suits and take pictures front and back." Gov't Ex. 4, ER 103. When Charis Jumoa-as reported that H.J. was reluctant to pose without her clothes, Mr. Rockett replied, "I will not sale them. I can only say they would be private for me only." *Id.* at ER 116.

Smith also found conversations between Mr. Rockett and a young girl, N.S., within Facebook records he obtained. RT 104. Those conversations were from April and May 2013. Gov't Ex. 2, ER 67-77. Mr. Rockett asked N.S. for some "high quality" photos of her that show "how you have grown and changed since the last time we see you." *Id.* at ER 67, 69. Mr. Rockett insisted that the pictures be "good quality" and "no shy," telling her to "stand back and hold the camera higher up and point it downwards to get full picture." *Id.* at ER 71. In a later digital conversation, N.S. described how the phone Mr. Rockett had purchased for her

---

[13] Mr. Rockett also used the phrase "front, back, no shy," in his Facebook communications with Charis Jumoa-as and with N.S. RT 110, 114.

was stolen. *Id.* at ER 75-76. Mr. Rockett offered to replace the phone, but informed N.S. that she would have to come over to his house to "work for a replacement phone." *Id.* at ER 77. N.S. understood that to mean that she would have to engage in sex acts with defendant. RT 729. N.S. responded, "Ill just go without one i don't want to do that stuff again… i have nightmares cus of it and i cry my self to sleep alot sense then…" *Id.*

### B. N.S., the Washington County Sheriff's Investigation, and Mr. Rockett's Prosecution in Washington County.

In 2013, Cheryl Schneider contacted the Washington County Sheriff's office to report concerns about inappropriate sexual behavior involving her 13-year-old daughter, N.S., and Mr. Rockett. RT 703. This occurred after N.S. showed her Facebook communications where Mr. Rockett was encouraging N.S. to take photos of herself in the shower and send them to him. RT 700-03.[14] Mr. Rockett told her he wanted photos "from the knees up," "front and back and no shy," so that he could see "how you have changed." Gov't Ex. 7, ER 146, 149-50.

Schneider first met Mr. Rockett in 2004 through her husband, Joe Schneider. RT 686. Joe Schneider worked at Synopsys, as did Mr. Rockett. RT 688. From February 2009 to July 2009, N.S. and her older sister stayed with Mr. Rockett while Schneider and her husband were experiencing financial instability and

---

[14] N.S. also told her mother, "He fucking raped me." RT 698.

homelessness. RT 691-92. Mr. Rockett was living on 179th in Aloha, Oregon at this time. RT 692. In 2011, N.S. and her older sister again lived with Mr. Rockett. RT 694.

According to N.S., Mr. Rockett gave her cell phones on three separate occasions and paid for the service. RT 718-19.[15] N.S. communicated with Mr. Rockett through Facebook using her cell phone. RT 719. Mr. Rockett wanted naked pictures of her. RT 722.[16] Mr. Rockett took naked pictures of her when she lived with him in 2011, and continued to seek pictures from her in 2013. RT 724; Gov't Ex. 2, ER 67-77. N.S. testified she was sexually abused by Rockett beginning in 2009, stating that he touched her vagina with his hands, his mouth, and his penis. RT 731-32. Mr. Rockett also took a photograph of her while he was abusing her. RT 731.[17]

---

[15] At the time of her testimony on May 20, 2016, N.S. was 17 years of age. RT 715. When she lived with Mr. Rockett in 2009, she was 9 turning to 10. RT 718.

[16] One of the Facebook messages, sent June 17, 2013, reads, "ok, you need to send them very soon . . . and they better be good quality and no shy." RT 724; Gov't Ex. 2, ER 71. Another message reads, "and make sure you show front and back and show everything no shy." *Id.* at ER 72. Again, on June 17, 2013, Mr. Rockett wrote: "ok, I have to get back to work. now would be a good time for you to go take a shower and take the pictures while you are in there so you get them done and out of the way." *Id.* at ER 73.

[17] In the video recording of her CARES Northwest interview, admitted as Government Exhibit 24, N.S. relates: "He stopped after he took his picture, the picture he said he wanted to go like 'balls deep' and he took a picture." In response to a question as to what the picture was of, N.S. responded, "Um, his dick in my vagina."

11

In August 2013, Washington County Sheriff's detectives sought and obtained a search warrant for Mr. Rockett's residence at 933 Goff Road, Forest Grove, Oregon. RT 841-42, 893. When the warrant was executed on August 23, 2013, the Sheriff's deputies recovered numerous digital media storage devices, a black Dell XPS computer tower, a silver X-Blade computer tower, a laptop computer, cellphones, digital cameras, gaming consoles, digital video recorders, and loose media drives. RT 893, 909. Investigators also found two alarm clocks that had digital cameras hidden inside of them.[18] A number of external hard drives were also recovered. RT 897; Gov't Exs. 21A and 21B.[19] One of the hard drives (Government Exhibit 21B) was subsequently discovered to have been completely encrypted with "a very strong encryption program." RT 897, 998.[20]

In Mr. Rockett's master bedroom, investigators found a black video wire running from a mini-DVR into the wall. RT 842, 845. They traced the wire to a pinhole camera (a "miniature spy cam") mounted inside a wall in the common

---

[18] One of the alarm clocks, a Sony Dream Machine alarm clock, is shown in Government's Exhibit 18. ER 184-96. A camera had been secreted inside this alarm clock. Images preserved on an "SD card" taken from the Sony Dream Machine alarm clock camera displayed a shower area in a hotel room. RT 1057.

[19] Government Exhibit 21B is a hard drive that was found on the desk in the office room area plugged into the black computer. RT 896. Government Exhibit 21A is also an external hard drive that was plugged into the black computer. RT 897.

[20] Although efforts were undertaken to break the encryption on this hard drive, including sending a copy to the FBI's Cryptologic Electronic & Analysis Unit, the encryption could not be bypassed. RT 917.

upstairs bathroom. RT 623, 679, 682, 844.[21] The camera was mounted inches from the ceiling and opposite the vanity, and "very difficult to notice, camouflaged if you will, just kind of a little – almost like a nail, if it were poking through something." RT 624.[22] The camera had a wide-angle view and it was angled down and toward the bathroom vanity and mirror, so as to take into its field of view the sink and the shower area. RT 684, 848. At the other end of the wire, this camera was connected to the mini-DVR that was hooked up to a TV set. RT 674-75.

Mr. Rockett was prosecuted in Washington County Circuit Court in two separate cases. In Washington County Circuit Court Case No. C132673CR, Mr. Rockett pled guilty to one count of attempting to use a child in a display of sexually explicit conduct and two counts of invasion of personal privacy. In Washington County Circuit Court Case No. C131929CR, Mr. Rockett was convicted by jury verdict of six counts of sexual abuse in the first degree, three counts of using a child in a display of sexually explicit conduct, two counts of

---

[21] *See also* Gov't Ex. 8, ER 157-83.

[22] Subsequent investigation revealed that a similar camera system may have been set up at Mr. Rockett's former residence located at 7539 179th Place, Aloha, Oregon. RT 627-28. Mr. Rockett sold the Aloha residence in September, 2012, before moving to the Forest Grove residence. RT 626. According to Washington County Sheriff's Detective Rookhuyzen the position of a wall patch in the upstairs hallway bathroom of the Aloha residence was significant because, with the bathroom door closed, the location of the wall patch provided an "unobstructed view into the shower area." RT 629; *see also* Gov't Ex. 25, ER 201-06.

sodomy in the second degree, and two counts of rape in the second degree.[23] ER 207.

### C.     Computer And Digital Evidence Analysis.

The electronic devices seized from Mr. Rockett's residence were submitted to the Northwest Regional Computer Forensic Laboratory for analysis. Mike Hanada (a Beaverton Police Department computer forensic analyst) examined the black Dell tower computer. RT 884-87.

Forensic analysis of the black Dell tower computer revealed that a WinRAR program had been run on the computer on August 12, 2013.[24] A WinRAR file called OOpreviews.RAR was also located on the black computer. RT 906. This file contained "several pictures of children, some of them naked, some of them being touched in a sexual manner, some of them posing in like a sexual provocative

---

[23] N.S. was one of the victims identified in connection with the charges brought in this case. RT 625.

[24] The black Dell tower computer was found underneath the desk in an office-type room. RT 984. The silver X-Blade computer was found in the living room. RT 984. The black computer, and as well other electronic media found at the Forest Grove residence, had been shipped to Mr. Rockett in interstate commerce from a location outside Oregon. RT 867-77; *see also* Gov't Exs. 15, 28. The user account for the black computer was for "Steve." RT 902. The password was "SteveR10." RT 902.

position." RT 906. [25] A number of encryption programs were found on the black computer, including the program "Stealth Encryptor." RT 985.

Evidence that the black computer had been used to visit a Russian website called IMGSRC.RU (also known as "Image Source") was uncovered during the forensic evaluation process. The black computer's browsing history revealed the presence of searches "on Image Source for naked pictures of children." RT 911. Further analysis linked the pictures of naked children found on the black computer to Image Source. RT 906-11.

On the silver X-Blade computer, videos depicting naked children were recovered, including versions of a video depicting images of two boys, identified as D.S. and B.S. RT 948-49. D.S. and B.S. had routinely stayed overnight at Mr. Rockett's Aloha and Forest Grove residences. RT 484-85, 492-93.[26] D.S. and B.S. took showers when they stayed overnight, sometimes on their own initiative and sometimes at Mr. Rockett's direction. RT 494, 518. On a number of occasions, while they were showering, Mr. Rockett entered the bathroom and took pictures of

---

[25] The purportedly contraband images found during the forensic examination of Mr. Rockett's computers, including video images of children in the Philippines and D.S. and B.S., are contained in Government Exhibit 10. RT 940-67, ER 218-49.

[26] D.S. and B.S. were friends with Mr. Rockett's sons. RT 483. Government Exhibit 20-1 (ER 197) is a photograph of B.S. at age 8. RT 485-86. Government Exhibit 20-2 (ER 198) contains photographic depictions of B.S. at age 10. RT 486. Government Exhibit 20-4 (ER 200) is a photograph of the upstairs hallway bathroom in the Aloha residence. RT 487.

them using a black Canon camera while they were showering. RT 495-97, 519.[27]

On several occasions, while they were showering Mr. Rockett entered and touched their genitals while holding his camera in his other hand. RT 500-02, 519-25.

Forensic analysis was conducted with respect to the SD card taken from the mini-DVD unit found in the Forest Grove residence master bedroom. This analysis led to the discovery of video images of the common bathroom with two sinks. RT 1029-31; Gov't Ex. 8, ER 157-83. These video images depict nude children and, on at least one occasion, Mr. Rockett is seen entering the bathroom and placing some towels on the counter. RT 1010; *see also* Gov't Ex. 10-21.[28] Forensic analysis was also conducted with respect to the Sony Dream Machine alarm clock that had been retrofitted with a camera inside it. RT 1012; Gov't Ex. 18, ER 184-96. From deleted data and preserved data contained on the Dream Machine clock camera SD card, a number of video depictions of nude children in a bathroom and showering were recovered. RT 1027.[29]

---

[27] D.S. and B.S. identified Government Exhibit 30 as being the camera Mr. Rockett used to take pictures of them while they were showering. RT 499, 520-21.

[28] Government Exhibit 10-21 contains excerpts from the video image data recovered from the mini-DVR. RT 1011-12. Additional video excerpts are found in Government Exhibits 10-18, 10-19, and 10-20. The videos depicting a bathroom scene with two sinks were recovered from the mini-DVR SD card. RT 1029-31.

[29] These video depictions are contained in Government Exhibits 10-22 and 10-23.

### D.     FBI Investigation.

In October 2014, the Federal Bureau of Investigation joined the investigation of Mr. Rockett. Taking the photograph introduced as Government Exhibit 1, FBI Special Agent Denise Biehn went to Cebu City, Philippines, in an effort to further identify and locate the children depicted in that photograph. RT 154-55. She also took with her images that had been discovered on Mr. Rockett's computer and that appeared to have been created by the camera found in the Sony Dream Machine clock radio, and a list of the children who had communicated with Mr. Rockett on Facebook. RT 153.[30]

When SA Biehn arrived in Cebu City, she went to an area of the city known as Barangay Luz. SA Biehn knew that Mr. Rockett had shipped items to the neighborhood kids in the Barangay Luz area. RT 158. A photograph found in Mr. Rockett's Comcast account was of a shipping box, which contained an address label – the address was Barangay Luz in Cebu City. RT 158-59.[31] Agent Biehn found the room displayed in Government Exhibit 1. RT 176-77.

---

[30] Government Exhibit 5, ER 125-45, contains photographic images of children that Agent Biehn first saw at the FBI's Regional Computer Forensics Lab in Portland, Oregon. RT 157. These images were produced from media seized from Mr. Rockett's computer and other devices following the execution of the search warrant at his Forest Grove residence. RT 156-57.

[31] Government Exhibit 6 contains a number of photographs of various locations in Barangay Luz, including photographs of the Golden Peak Hotel, and of a room and shower in that hotel. RT 160-61.

SA Biehn and other agents interviewed a number of Filipino children who had contact with Mr. Rockett from 2000-2012. Several of these children described how Mr. Rockett provided them with gifts and offered his hotel room to them to watch television, play games, and take showers.[32]

As a result of the FBI's investigation, a number of Filipino children were identified who had been involved with Mr. Rockett. Several of these children were brought to the United States to testify at Mr. Rockett's trial.

G.G. testified that he first met Mr. Rockett when he was 12 years old through Facebook. RT 181.[33] Later, he met Mr. Rockett in Cebu City in 2012. RT 206-07. One evening, Mr. Rockett invited G.G. and his friends to go to his Park Lane Hotel room. RT 182. In addition to resting on the bed in the hotel room, G.G., and several other boys took a shower. RT 184-86. While they were showering, G.G. noticed that Mr. Rockett had entered the bathroom. RT 186. Mr. Rockett did not knock on the door before entering the bathroom. RT 187-88. When

---

[32] Government Exhibit 27 contains photographs of the children SA Biehn interviewed, including G.G., H.J., M.G., and John Dave. RT 163-65. Agent Biehn characterized M.G. as being "a little girl." RT 165.

[33] As of the date of his appearance as a witness in Mr. Rockett's trial, May 17, 2016, G.G. was 16 years of age. RT 194.

he entered the bathroom, Mr. Rockett was carrying a big Canon camera. RT 188.

Mr. Rockett took a picture; all boys were naked at the time. RT 188-89.[34]

After the night in the hotel room, G.G. kept in touch with Mr. Rockett

through Facebook. RT 190. G.G. received gifts from Mr. Rockett after Mr. Rockett

returned to the United States – gifts such as shorts, chocolates, candies, and T-

shirts. *Id.* G.G. also recalled that, while chatting with Mr. Rockett on Facebook,

Mr. Rockett asked him to send him a "privacy picture." RT 190. G.G. understood

this request to refer to a picture of him in the nude. RT 191.[35] G.G. did not send a

picture. RT 193.[36]

V.P., a Filipino male sixteen years of age at the time of Mr. Rockett's trial,

first met Mr. Rockett when he was six years old because Christine Jumoa-as was a

neighbor in Barangay Luz. RT 216-17.[37] On several occasions, V.P. visited Mr.

---

[34] When Mr. Rockett walked into the bathroom, G.G. tried to cover himself up. RT 189. Mr. Rockett told him, "Don't be shy." *Id.* Mr. Rockett did not try to touch G.G. while G.G. was in the shower. RT 189.

[35] According to G.G., Mr. Rockett wanted G.G. to have his friend use a camera to take a picture of G.G.. RT 191.

[36] During cross-examination, defense attorney Coit showed G.G. a photograph of G.G. holding an LBC box. RT 195, 207. G.G. acknowledged knowing that Mr. Rockett sent LBC boxes to Jefferlyn Llamos to give to Filipino children. RT 208. Jefferlyn Llamos is the sister of John Dave. RT 208. John Dave is approximately 5 years older than G.G., and Jefferlyn is 4 to 5 years older than John Dave. RT 208.

[37] According to V.P., Charis Jumoa-as still lives in Barangay Luz. RT 216. Charis Jumoa-as has a daughter named H.J.. RT 217. H.J. is younger than V.P. *Id.*

Rockett in his hotel room. When V.P was 12 years old, he went to the hotel and to the beach with Mr. Rockett. RT 218. V.P. went to the hotel with his friends G.G. and others. RT 218-219. All of these friends were about V.P.'s age. RT 220. While he was in Mr. Rockett's room at the hotel, V.P. took a shower with his friends. It was their idea to take a shower. RT 221.

V.P. recalled a second occasion when he showered in Mr. Rockett's hotel room but nothing happened. RT 227. However, in 2012, he again went to Mr. Rockett's hotel room with five of his friends. *Id.* On this occasion, while V.P. and several of the boys were naked in the shower, Mr. Rockett took their picture. RT 221, 227.[38] When V.P. tried to cover his body, Mr. Rockett told him not to. RT 222. Mr. Rockett never touched V.P. inappropriately. RT 232. V.P. never went back to Mr. Rockett's hotel room "because of the pictures." RT 234.

V.P. spoke with Mr. Rockett online using the computer. RT 223. They talked about clothes. *Id*. Mr. Rockett sent gifts to V.P., including clothes and a cell phone with a camera. RT 223. Mr. Rockett did not ask V.P. to take any photographs with the cell phone. RT 223-24.

M.G. first communicated with Mr. Rockett using her Facebook account. RT 246. She never met him in person, but saw him on a web camera. RT 252. Mr.

---

[38] V.P. testified that Mr. Rockett entered the bathroom and began taking pictures without permission. RT 222. He was using a Canon camera. RT 222.

Rockett wanted her and H.J. to take pictures of themselves. RT 247. He wanted pictures without their clothes on. *Id.* [39] M.G. did not respond to Mr. Rockett's request. RT 249. However, Charis Jumoa-as, H.J.'s mother, took photographs of both M.G. and H.J. with and without clothes on. RT 250, 258.[40]

John Dave, who lives in Cebu City, first met Mr. Rockett when he was 10-13 years of age. RT 265.[41] At the time he met Mr. Rockett, Mr. Rockett was handing out 100 pesos to each child who was willing to fall into a line. RT 265. Mr. Rockett then took at least 15 kids to the cinema. RT 266.

The next time John Dave saw Mr. Rockett was at the Park Lane Hotel. RT 268. He was invited to go to the Park Lane Hotel by a neighbor. RT 268. At the time John Dave went to the Park Lane Hotel, he was approximately 12 to 13 years

---

[39] At the time she testified in Mr. Rockett's trial, on May 18, 2016, M.G. was 11 years old and attending the sixth grade in elementary school. RT 244. H.J. is approximately one year older than M.G.. RT 248.

[40] According to M.G., when Charis Jumoa-as took the photographs of her without her clothes on, she felt bad. RT 251. At a later point in the trial, Judge Simon received a note from a juror (Court Exhibit B) to the effect that, in the Philippines, "no clothes" does not necessarily mean naked, but could also mean that a person is wearing a swimsuit or underwear. RT 302.

[41] At the time he testified in Mr. Rockett's trial on May 18, 2016, John Dave was 20 years old. RT 263.

of age and in grade 4 or 5. RT 269. John Dave took a shower at the hotel with his cousin. RT 271.[42] Another younger child was with them in the shower. RT 271.[43]

While John Dave was in the bathroom at the Park Lane Hotel, Mr. Rockett approached him and began touching him. RT 276. Mr. Rockett touched his legs and tried to stroke his penis. *Id.* John Dave was "scared." *Id.* Mr. Rockett also put his mouth on John Dave's penis, and told him he "should not tell everyone or anyone." RT 276-77. After the shower event at the Park Lane Hotel, Mr. Rockett sent John Dave some gifts, including a Gameboy. RT 279. Mr. Rockett also gave John Dave's sister, Jefferlyn, a laptop. *Id.*

## SUMMARY OF THE ARGUMENT

"Hard cases make bad law,"[44] and equally so, "bad law makes hard cases."[45] This is even more so when the subject matter is socially sensitive and inflammatory. Reacting to the child sex abuse crisis that has affected America's

---

[42] With specific reference to the photographs contained in Government Exhibit 5, John Dave testified that he believed they were taken in 2007 when he was 11 years old. RT 289.

[43] According to John Dave, it was Mr. Rockett's idea to take a shower. RT 271. John Dave identified himself as being depicted in some of the photographs in Government Exhibit 5. RT 271-72. He also identified his sister, Jefferlyn, his brother, John Hazel, and Mr. Rockett as being shown in the photographs in Government Exhibit 5. RT 274, 279. John Dave thought Jefferlyn was 14 at the time and his brother "probably 16 or 17." *Id.*

[44] *N. Sec. Co. v. United States,* 193 U.S. 197, 364 (1904) (Holmes, J., dissenting).

[45] *Turner v. Nelson-Dykes*, 461 F. Supp. 892, 894 (N.D. Tex. 1978).

social, cultural, political, and legal orders for decades,[46] the Ninth Circuit and other courts have drifted away from the text of the statutory tools that Congress has made available for the prosecution of those engaged in the production of child pornography, substituting for the objective statutory elements other, more subjective criteria for what renders an image a "lascivious exhibition of the genitals or pubic region" (hereinafter, "Lascivious Exhibition") of a minor. This drift raises constitutional vagueness and separation of powers issues that can only be avoided by an objective reading of the statutory definitions for determining when a depiction of a nude child constitutes a depiction of "sexually explicit conduct."

Mr. Rockett challenges his § 2251(a) convictions for insufficiency of the evidence insofar as those convictions rest on depictions of nude children (as contained in Government Exhibits 5 and 10-15 through 10-23) that do not qualify as depictions of sexually explicit conduct.[47] The primary ground for this claim of insufficiency is that the sixth *Dost* test factor, as employed by the district court in its Rule 29 decision, and in its jury instructions, introduced a non-statutory element

---

[46] *See* Amy Adler, *Inverting The First Amendment*, 149 U. Pa. L. Rev. 921, 933 (2001) ("[T]he crisis of child sexual abuse has become an 'obsession' in our culture and politics.").

[47] Government Exhibit 10 is in the possession of the government. The Court will have to request its production.

into the determination of the § 2251(a) charges. This non-statutory element is, however, constitutionally vague. Therefore, it should not have been employed by Judge Simon to deny Mr. Rockett's Rule 29 motion. Nor should it have been communicated to the jury as a component of the jury instruction explaining the meaning of the § 2256(2)(A)(v) term "Lascivious Exhibition." Moreover, to the extent that the charges made against Mr. Rockett required proof as to the involvement of minors in "sexually explicit conduct," Mr. Rockett contends it is now impossible to determine whether the jury, in reaching its verdicts, impermissibly relied on the improperly admitted non-pornographic evidence as opposed to the few pornographic depictions of "sexually explicit conduct" contained in Government Exhibit 10. Consequently, with the exception of the verdict on Count 6, the verdicts entered against Mr. Rockett as to Counts 1, 4, 5, 7, 8, and 9 should be viewed as unsound, and his convictions reversed.

## ARGUMENT

**IV. MR. ROCKETT'S CONVICTIONS FOR PRODUCTION OF CHILD PORNOGRAPHY, IN VIOLATION OF 18 U.S.C. § 2251(A), ARE NOT BASED ON EVIDENCE SUFFICIENT TO SUPPORT A DETERMINATION OF GUILT BEYOND A REASONABLE DOUBT.**

The Due Process Clause protects an accused "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Furthermore,

24

> *In re Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

*Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

The government's proof in this case consisted in large part of videos depicting nude children. It is Mr. Rockett's contention that these videos, as contained in Government Exhibit 10, do not depict minors engaged in "sexually explicit conduct," and that in the absence of these videos the proof relied on by Judge Simon in denying his Rule 29 motion, and by the jury in returning the verdicts of guilty as to Counts 4, 5, 7, and 8, is Constitutionally deficient.

### A.    Standard Of Review

Under Ninth Circuit law the standard of review for a claim pertaining to whether video/photographic depictions depict sexually explicit conduct involving minors is the clearly erroneous standard. *United States v. Overton*, 573 F.3d 679, 688 (9th Cir. 2009). The denial of a Rule 29 motion is subject to de novo review. *United States v. Munoz*, 233 F.3d 1117, 1129 (9th Cir. 2000). "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Claims not raised in

the district court are reviewed for plain error. *See United States v. Gonzalez-Aparicio,* 663 F.3d 419, 428 (9th Cir. 2011).

**B.    The *Dost* Factors – And In Particular Factor Six – Introduce A Subjective Interpretation Of The Term "Lascivious Exhibition" That Is Not Supported By §§ 2251 And 2256(2)(A).**

Mr. Rockett contends that Judge Simon erred, not only in his reliance on the child pornographic depiction factors identified in *United States v. Dost*[48] in rejecting Mr. Rockett's Rule 29 motion as to Counts 4, 5, 7, and 8, but as well by allowing various video depictions of nude children to go to the jury, and by instructing the jury that the *Dost* factors could be used to determine whether those video depictions where subject to characterization as "Lascivious Exhibitions" in proof of the § 2251(a) charges.[49] To appreciate how the *Dost* test morphed from District Judge Thompson's attempt to formulate a methodology for evaluating photographs of children for pornographic content into a factor enjoying element status in the prosecution of child pornography cases under statutes such as 18 U.S.C. §§ 2251(a), 2251(c), and 2252A(a)(5)(B), requires a close reading of the *Dost* opinion as well as the follow-up opinion in *United States v. Wiegand.*[50]

---

[48] 636 F. Supp. 828 (S.D. Cal. 1986) (Thompson, J.).

[49] *See* Jury Instr. Nos. 19, 24, 25; ER 21-22, 28-29.

[50] 812 F.3d 1239 (9th Cir. 1987).

In *Dost*, District Judge Thompson presided over a stipulated facts trial involving two defendants, Dost and Wiegand, charged with violating 18 U.S.C. § 2251(a). In proof of the charges, the government adduced two exhibits containing what it contended were pornographic images of children. One exhibit contained 21 photographs of a 14 year old nude female in various poses; the other exhibit a single photograph of a nude "10-year-old-girl" at the beach. *Dost*, 636 F. Supp. at 830.

Based on his viewing of the photographs, Judge Thompson was of the opinion that, for purposes of satisfying § 2251(a)'s requirement that the defendants be shown to have undertaken activity to cause the minors involved to engage in "sexually explicit conduct," it was necessary to establish that the photographs constituted a "Lascivious Exhibition" per then 18 U.S.C. § 2255(2)(E). *Id*. In aid of this determination, Judge Thompson articulated the *Dost* test factors:

> [T]his Court feels that, in determining whether a visual depiction of a minor constitutes a "lascivious exhibition of the genitals or pubic area" under § 2255(2)(E), the trier of fact should look to the following factors, among any others that may be relevant in the particular case:
>
> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> 4) whether the child is fully or partially clothed, or nude;

27

> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
>
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.
>
> Of course, a visual depiction need not involve all of these factors to be a "lascivious exhibition of the genitals or pubic area." The determination will have to be made based on **the overall content of the visual depiction**, taking into account the age of the minor.

*Dost*, 636 F. Supp. at 832 (emphasis added). With the exception of a reference to District Judge Miller's description of "sexual coyness" in *United States v. Nemuras*, 567 F. Supp. 87 (D. Md. 1983), Judge Thompson did not provide any explanation or justification for factors 1-4, and 6. However, given Judge Thompson's emphasis on examination of "the overall content of the visual depiction," it does not appear he contemplated that the six articulated factors would be used to transform the determination of "Lascivious Exhibition" from an analysis of the content of a depiction into a projection as to what intent the factfinder might impute to the producer/viewer of the depiction. Indeed, examination of Judge Thompson's analysis of the depictions discloses a close attention to their content and the conduct displayed – "The focal point of the photographs are the girl's well-developed genitalia;" "some of the poses border on the acrobatic in order to obtain an unusual perspective on her genitalia;" "[a]ll of these poses would have to be

characterized as sexual poses, not the way a child or adult ordinarily sits or reclines." *Dost*, 636 F. Supp. at 833.[51]

When the case went up on appeal, the Ninth Circuit panel criticized Judge Thompson's factors as implying, "as to the 17[sic]-year old girl that the pictures would not be lascivious unless they showed sexual activity or willingness to engage in it." *Wiegand*, 812 F.2d at 1244. The panel proceeded to articulate a highly subjective text:

> In the context of the statute applied to the conduct of children, lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles. . . . The picture of a child "engaged in sexually explicit conduct" within the meaning of 18 U.S.C. §§ 2251 and 2252 as defined by § 2255(2)(E) is a picture of a child's sex organs displayed lasciviously—that is, **so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur**.

*Id*. (emphasis added).

The *Wiegand* opinion declares that the "crime is the offense against the child . . . the invasion of the child's vulnerability." *Id.* at 1245. However, the *Wiegand* opinion completely overlooked the harm rationale advanced by the Supreme Court

---

[51] Discussing an example he posed in demonstration of his evaluation methodology, Judge Thompson observed: "[I]f the girl is wearing clothing appropriate for her age and is sitting in an ordinary way for her age, the visual depiction may not constitute a "lascivious exhibition" of the genitals, despite the fact that the genitals are visible." *Dost*, 636 F. Supp. at 832.

in excluding child pornography from First Amendment protection – "Here the nature of the harm to be combated requires that the state offense be limited to works that *visually* depict **sexual conduct by children** below a specified age." *New York v. Ferber*, 458 U.S. 747, 764 (1982) (emphasis added).[52]

By encapsulating the *Dost* factors within an analytical perspective framed by the "eye of the pedophile," the *Wiegand* opinion strays far from the plain meaning of the statutory text found in §§ 2251(a) and 2256(2)(A). To the extent that the *Wiegand* view dominated Judge Simon's decision-making during the course of Mr. Rockett's trial, Mr. Rockett contends he was denied due process of law.

### 1. A plain reading of § 2251(a) limits its application to depictions involving actual sexual conduct.

The Protection of Children Against Sexual Exploitation Act of 1977 (18 U.S.C. § 2251 *et seq*.) criminalizes the knowing production of child pornography. The original statute subjected to criminal penalty any person who employed, used, persuaded, induced, enticed, or coerced any minor to engage in, or assist another

---

[52] "Although the Supreme Court in *Ferber* announced five reasons that supported the exclusion of child pornography from First Amendment protection, the fundamental focus of these rationales was this: child pornography must be prohibited because of the grievous harm done to children in the production of the material. **The key to the Court's reasoning was that the production of child pornography requires an act of child sexual abuse."** Amy Adler, *The "Dost Test" in Child Pornography Law: "Trial by Rorschach Test"*, in *Refining Child Pornography Law: Crime, Language and Social Consequences* 81, 83 (Carissa Byrne Hessick ed., 2016) (emphasis added).

person in engaging a minor in, any sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and also penalized parents, legal guardians, and custodians of minors who knowingly permitted the minors to engage or assist in such conduct. The provisions of 18 U.S.C. § 2251 were subsequently amended in 1984, 1986, and 1988, so as to expand the reach of the statute by raising the age of those defined as "minors" under the substantive provisions, by adding a subsection reaching those facilitating the distribution of child pornography by printing or publishing the offending visual depictions, by changing the term "lewd" to lascivious," by incorporating into the definition of "sexually explicit conduct" acts involving "Lascivious Exhibition," and by sharply increasing the penalties for conviction under the statute.

As it currently reads, § 2251(a) provides in pertinent part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . **any sexually explicit conduc**t for the purpose of producing **any visual depiction of such conduct** shall be punished as provided under subsection (e) . . . .

(emphasis added).[53] In a separate definitional section, the phrase "sexually explicit conduct" is narrowed to five specific types of sexual conduct:

> For purposes of this statute, "sexually explicit conduct" means actual or simulated—

---

[53] A plain reading of subsection (e) shows that it is a violation of § 2251 to attempt to commit the crime defined in subsection (a) of § 2251. *United States v. Johnson*, 639 F.3d 433, 438 (8th Cir. 2011).

(i) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person.

18 U.S.C. §§ 2256(2)(A)(i)-(v).

When interpreting a statute, the starting point is always the language of the statute itself. *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982). Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use. *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Richards v. United States*, 369 U.S. 1, 9 (1962). When the statutory language is clear, "the words must be interpreted in accordance with their ordinary meaning." *United States v. Knox*, 32 F.3d 733, 744 (3d Cir. 1994).

In *United States v. Williams*, 553 U.S. 285, 297 (2008), Justice Scalia addressed the term "sexually explicit conduct," as contained in 18 U.S.C. § 2256(2)(A), stating: "'Sexually explicit conduct' **connotes actual depiction of the sex act** rather than merely the suggestion that it is occurring." (Emphasis added). Hence, and in accordance with the statutory construction canon of ejusdem generis, each of the subsections of § 2256(2)(A) should be read as describing

conduct that is performed by the depicted minor if an image is to be characterized as a child pornographic image of sexually explicit conduct.[54]

Legislative history is also a useful tool for statutory interpretation when it represents "the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen*, 396 U.S. 168, 186 (1969). For this reason, the most authoritative sources of legislative history are congressional reports. *Garcia v. United States*, 469 U.S. 70, 76 (1984) (citing *United States v. O'Brien*, 391 U.S. 367, 385 (1968)).

The sponsors of the original bill that became § 2251(a) made it clear that the statute was designed to exclude mere nudity while prohibiting conduct that was "sexual in nature." S. Rep. No. 95-601 (1977) (Conf. Rep.).[55] The 1984 Revisions to the statute substituted the words "lascivious exhibition of genitals" for the words "lewd exhibition of genitals." Initially, the 1984 revision legislation replaced the phrase "lewd exhibition of the genitals or pubic area of any person" with "display

---

[54] In accordance with the ejusdem generis canon "when a general word of phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." *Black's Law Dictionary* 631 (Bryan A. Garner, ed., 10th ed. 2014). The canon is applicable to lists of actions. *See, e.g., Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.,* No. 2:12-cv-546, 2013 WL 12131747, *10 (E.D. Va. Aug. 23, 2013).

[55] The Senate Conference Committee Report expressed that it was "the intent of the conferees that the definition of 'sexually explicit conduct' be interpreted so as to apply only to conduct that is sexual in nature." S. Rep. No. 95-601, at 6 (1977) (Conf. Rep.).

of the genitals or pubic area for the purpose of arousing or inciting sexual desire." S. Rep. No. 98-169, at 9 (1983). However, this subjective wording was subsequently rejected in favor of the more objective phrase "lascivious exhibition of the genitals or pubic area of any person." Child Protection Act of 1984, Pub. L. No. 98–292, § 5, 98 Stat. 204 (1984). In adopting language focusing on the conduct depicted, Congress rejected a subjective standard as to whether the creation of an image had the purpose of arousing the viewer in favor of an objective standard based on the characteristics of the conduct portrayed in the image. Thus, the legislative record supports the plain meaning of "sexually explicit conduct" as referring to the minor's depicted conduct and not a viewer's purported response to that depicted conduct.

Under controlling principles of statutory interpretation, reading §§ 2251(a) and 2256(2)(A) in conjunction, "Lascivious Exhibition" must be understood as an instance of "sexually explicit conduct" that involves recognizably sexual behavior on the part of the depicted child. The images of surreptitiously video-photographed nude children engaged in bathroom activities, offered in Mr. Rockett's case by the government in proof of Counts 4, 5, 7 and 8, do not depict sexually explicit conduct. Depictions that amount to no more than nude photographs of children are subject to First Amendment protection and do not satisfy § 2256(a)(2)'s

requirements. *See Ferber*, 458 U.S. at 765 n.18 (1982) ("nudity without more is protected expression").[56]

> **2. Section 2256(2)(A)(v)'s "Lascivious Exhibition" text describes a sex act; this provisions does not call for inferences as to what was in the mind of a photographer photographing a nude minor.**

The term "lascivious" is not vague. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78-79 (1994).[57] Similarly, the ordinary understanding of the word 'exhibition' "is a showing or presenting to view." *United States v. Price*, 775 F.3d 828, 837-38 (7th Cir. 2014). Read together, these terms denote a form of conduct on the part of the minor depicted that is subject to characterization as "sexually explicit conduct."[58]

---

[56] Section 2251(a) requires more than the nude depiction of a child; rather "the film must depict sexually explicit conduct." *United States v. Steen*, 634 F.3d 822, 826 (5th Cir. 2011).

[57] According to Black's Law Dictionary, "lascivious" means conduct "tending to excite lust; lewd; indecent; obscene." *Black's Law Dictionary* 1013 (Bryan A. Garner ed., 10th ed. 2014).

[58] The word "lascivious" both modifies and is modified by the word "exhibition." *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("quoting limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.") Thus, the plain meaning of the "lascivious exhibition" phrase requires that the exhibition – the conduct whereby the minor's genitals are displayed – be lascivious. Whether a minor has engaged in a "Lascivious Exhibition" depends on how the exhibition itself occurs and is memorialized; there is no language in the current statutory text, whether § 2251(a) or § 2256(2)(A), suggesting that the characterization of a depiction as "sexually explicit conduct" should be influenced by any assumed or projected reaction on the part of a viewer.

35

In *United States v. Knox*, the Third Circuit construed the phrased "Lascivious Exhibition" as follows:

> [A]s used in the child pornography statute, the ordinary meaning of the phrase "lascivious exhibition" means a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer.

32 F.3d at 733.

From a plain or ordinary meaning viewpoint, "Lascivious Exhibition" describes a sex act; the text of § 2256(2)(A)(v) does not call for speculation as to what might have been in the mind of a photographer or videographer when photographing a nude child. The federal government has previously concurred in this reading when analyzing § 2251(a). As noted in *United States v. Carroll*, 227 F.3d 486, 488 n.2 (5th Cir. 2000) (per curiam):

> The Government's en banc brief states in relevant part:
>
> After a thorough and searching review of the plain wording of 18 U.S.C. § 2251(a) and the legislative history addressing it at the time it was enacted, and other pertinent legislative history, the government concedes, that a violation of Section 2251(a) requires that the defendant employ, use, persuade, induce, entice or coerce **the minor himself to engage in the actual or simulated sexually explicit conduct for the purpose of producing a visual depiction of the minor's sexually explicit conduct**.

(emphasis added).[59]

---

[59] This is not the only occasion where the government has advanced an interpretation of § 2251(a) that focuses on the requirement that the depicted child

This does not mean that the conduct of a defendant may not be taken into consideration when evaluating a particular depiction. A "Lascivious Exhibition" may be generated by an individual who undertakes to modify an otherwise protected depiction of child nudity so as to cause the depicted child to be displayed "as if" engaged in a lascivious exhibition of his or her genitals. *See, e.g., United States v. Horn*, 187 F.3d 781, 788-90 (8th Cir. 1999).[60] Nor does this mean that individuals are free to surreptitiously photograph or video nude children while they

be shown engaging in sexually explicit conduct. In *Knox*, Solicitor General Drew Days argued that the term "lascivious" means that the child depicted is "lasciviously engaging in sexual conduct (as distinguished from lasciviousness on the part of the photographer or consumer.)" Adler, *The "Dost Test" in Child Pornography Law*, *supra* note 52, at 90.

[60] In *Horn*, the appellate panel reviewed a number of videotapes Horn claimed were simply depictions of children engaged in normal activities. Horn argued that the depictions were not pornographic. The panel rejected this contention:

> One of the two tapes in question shows children and adults on a topless beach and the other depicts nude children playing on a jungle gym; in both, the video tape freeze-frames images of young girls. Mr. Horn concedes that the girls depicted in the freeze-framed portions of the tapes were minors. After reviewing the two tapes in question, we find that they do contain lascivious exhibitions of the genitals and pubic areas of minors. **Shots of young girls are freeze-framed at moments when their pubic areas are most exposed**, as, for instance, when they are doing cartwheels; **and these areas are at the center of the image and form the focus of the depiction**. In the beach scenes, the girls are wearing swimsuit bottoms, but a reasonable jury could conclude that the exhibition of the pubic area was lascivious despite this minimal clothing because of the way in which the pictures are framed.

187 F.3d at 789-790 (emphasis added).

are playing or performing hygiene activities. *See United States v. Johnson*, No. 2:10-cr-71, 2011 WL 2446567, *9 (M.D. Fla. June 15, 2011) ("Under 18 U.S.C. § 1801(a), anyone who has the intent to capture an image of a private area of an individual without their consent and knowingly does so under circumstances in which the individual has a reasonable expectation of privacy commits video voyeurism.").

### 3. Judge Simon's use of the *Dost* factors introduced vagueness into the determination of whether Mr. Rockett violated § 2251(a).

In the Ninth Circuit and elsewhere, the *Dost* factors have become the "go to" criteria for evaluating whether depictions of minors represent depictions of "sexually explicit conduct" for purposes of 18 U.S.C. § 2251(a). *Overton*, 573 F.3d at 686 ("In our circuit the trier of fact will often look to six factors to determine whether a visual depiction of a minor constitutes a 'lascivious exhibition of the genitals or public area' in a particular case."); *see also Steen*, 634 F.3d at 829 (5th Cir. 2011) (Higginbotham, J., concurring) ("The *Dost* factors are not definitionally equivalent to the statutory standard of 'lascivious exhibition of the genitals,' but many courts have treated them as such, even requiring that a certain number of

factors be present for pornography convictions. As a result, these factors often create more confusion than clarity.").[61]

After the close of the defense case, attorney Coit raised a Rule 29 motion for judgment of acquittal as regards the sufficiency of the evidence pertaining to Count 4 (attempted production of child pornography as to MG), Count 5 (attempted production of child pornography as to HJ), Count 7 (production of child pornography as to DS), Count 8 (production of child pornography as to BS), and Count 9 (possession of child pornography). RT 1092-95; ER 37-40. With respect to Counts 7 and 8, attorney Coit argued that the videos of D.S. and B.S. (as contained in Government Exhibits 10-21 and 10-22) did not meet the six-part *Dost* test:

> These are images where the focal point of the image is simply not the child's genitalia. The images are not sexually suggestive. They are placed and posed in a bathroom. Bathrooms are not generally associated with sexual activity. The children are not inappropriate poses or inappropriate attire. They are not wearing anything. They are nude, so that factor would cut against us on that issue. They do not suggest sexual coyness or a willingness to engage in sexual activity, and there was no proof that the image was intended or designed to elicit a sexual response from the viewer.

---

[61] The *Dost* test factors have been subject to critical disapproval. *See United States v. Hill*, 322 F. Supp. 2d 1081, 1084 (C.D. Cal. 2004) (Kozinski, J., sitting by designation) ("While the *Dost* factors attempt to bring order and predictability to the lasciviousness inquiry, they are highly malleable and subjective in their application."); *see also* Adler, *Inverting The First Amendment*, *supra* note 46, at 953-54 (2001) ("[T]he Dost test has produced a profoundly incoherent body of case law.").

RT 1094. Prior to hearing from government counsel, Judge Simon advised: "I am especially interested in the Government's position on defendant's motions against Counts 7 and 8 and specifically with respect to instruction No. 24, the lascivious exhibition." RT 1095; ER 40.

Responding to attorney Coit's Rule 29 motion as to Count 4, AUSA Sussman argued that "[t]here really is no uncertainty at all that Steven Rockett wanted what he called 'special pictures' of her, which she understood, even at her tender age, to mean naked pictures." RT 1096; ER 41. AUSA Sussman then proceeded to equate "naked pictures" with "sexually explicit photos of [M.G.]." *Id.* Responding to the motion as to Count 5, AUSA Sussman again suggested that Mr. Rockett's desire for "naked photos" was the equivalent of asking for "sexually explicit photos." RT 1097; ER 42.

With respect to Counts 7 and 8, AUSA Sussman argued that both B.S. and D.S. testified that on numerous occasions Mr. Rockett had "barged into the bathroom, without knocking, with camera in hand, and took photographs of them in the shower." *Id.* According to Sussman, Mr. Rockett "was looking to create explicit images of them and their naked bodies that would evoke a sexual interest in the viewer – the viewer being Steven Rockett." *Id.* Judge Simon adopted AUSA Sussman's argument tout court:

> I'm not going to say anything other than that I agree with what Mr. Susman has just argued, but I will point out with respect to Count 7

40

and Count 8, I am satisfied that there are at least two of the factors
satisfied. Obviously the defendant concedes the factor where the child
is nude. But I also do believe, as Mr. Sussman has argued, that
another factor is satisfied, and that is whether the image is intended or
designed to elicit a sexual response in the viewer. I agree that, here,
the relevant viewer is Steven Rockett, and I'm satisfied with the
evidence presented in trial that we do have a jury question, at least on
that factor as well.

RT 1099; ER 44.[62]

In rejecting Mr. Rockett's Rule 29 motion, Judge Simon relied on *Dost*
factors 4 and 6. While the fourth factor is relatively benign, the sixth factor has
been characterized as "the most difficult to apply – whether the visual depiction is
intended or designed to elicit a sexual response in the viewer." *Steen*, 634 F.3d at
827-28. Indeed, as Circuit Judge Higginbotham recognized in his concurring
opinion in *Steen*:

The sixth factor, which asks whether the visual depiction was
intended to elicit a sexual response in the viewer, is especially
troubling. Congress did not make production of child pornography
turn on whether the maker or viewer of an image was sexually
aroused, and **this Dost factor encourages both judges and juries to
improperly consider a non-statutory element**. A pedophile may be

---

[62] AUSA Sussman continued to use the term "sexually explicit" rather than
"sexually explicit conduct" in closing argument. RT 1141, 1144-45 Whether an
image is "sexually explicit" is a matter of subjective judgment. Section 2251(a)
does not proscribe the creation of sexually explicit images, it proscribes the
creation of images of "sexually explicit conduct." As noted by Ninth Circuit Judge
John T. Noonan Jr., sitting by designation, in *Doe v. Chamberlin*, 299 F.3d 192,
196 (3d Cir. 2002): "Congress has chosen to criminalize only photos of the
genitalia or pubic areas and of these parts only when they are the subject of
'lascivious exhibition.' Only then do they qualify as "sexually explicit conduct."

41

aroused by photos of children at a bus stop wearing winter coats, but these are not pornographic. Conversely, a photographer may be guilty of child pornography even though he is not aroused by the photos he produces purely for financial gain. **Regardless of whether the photographer was aroused by the images he produced, to qualify under § 2251, the images must show a minor being used to engage in sexually explicit conduct**.

*Id.* at 829 (Higginbotham, J., concurring) (footnotes omitted; emphasis added).[63]

There is nothing in § 2251(a) or in § 2256(2)(A) that suggests that, whether an image qualifies as a depiction of "sexually explicit conduct" in some way turns on "whether the photographer was aroused by the images he produced." *Id.* Instead, what is called for by the statute is proof that the images produced by a defendant contain depictions of minors engaged in sexually explicit conduct.

### C. The Conjoining Of *Dost* Factor Six And The Criteria Requisite To Proof Of The § 2251(a) Charges Rendered Those Charges Constitutionally Vague In Violation Of Mr. Rockett's Due Process Entitlements To Fair Notice And Freedom From Arbitrary Enforcement Of The Law.

The "law must give fair and adequate notice of the conduct constituting a criminal offense if punishment for the commission of that offense is to be just."[64] A law "fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits. . .

---

[63] *See also Doe v. Chamberlin*, 299 F.3d at 196: "The final Dost factor simply puts again the underlying question: Is the exhibition lascivious."

[64] Paul H. Robinson, 1 *Criminal Law Defenses* 149 (1984).

." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966). Moreover, in order to place a reasonable limit on the arbitrary and discriminatory enforcement of a law, "it is sensible for a court to examine whether a particular statute adequately constrains the discretion to invoke the criminal process, by clearly indicating to the ordinary police officer or prosecutor what conduct is proscribed."[65]

Although the vagueness doctrine has two rationales, fair notice and the limiting of arbitrary and discriminatory enforcement, it is the latter rationale that is viewed as most important. As noted by Justice O'Connor:

> [T]he more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement." Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policeman, prosecutors, and juries to pursue their personal predilections."

*Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted).

The text of § 2251 has previously been upheld against a vagueness attack. *United States v. Ruggierio*, 791 F.3d 1281, 1290-91 (11th Cir. 2015). Similarly, § 2256(2)(A)(v)'s language pertaining to "lascivious exhibition of the genitals or pubic area" has withstood a vagueness challenge. *United States v. Freeman*, 808 F.2d 1290, 1292 (8th Cir. 1987).

---

[65] Robert Batey, *Vagueness and the Construction of Criminal Statutes – Balancing Acts*, 5 Va. J. Soc. Pol'y & L. 1, 6 (1997).

43

In the instant case, however, we have the conjunction of § 2256(2)(A)(v)'s "Lascivious Exhibition" language and the sixth *Dost* factor's invitation to fact finders to pry into the mind of a purported offender in order to determine "whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Dost*, 636 F. Supp. at 832; Jury Instr. No. 24, ER 28. How this hybrid criterion is to applied by judge or jury, without assuming the critical point at issue (i.e. whether the defendant intended to create an image of "sexually explicit conduct"), remains unknown.

In *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999), the Supreme Court declared, with respect to enactments that threaten to intrude on First Amendment expressive rights, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."[66] The First Amendment protection afforded to depictions of nude children may be small, but it is nonetheless

---

[66] In *Morales*, the Court recognized that the term "loiter" had a "common and accepted meaning." However, as redefined in a Chicago city ordinance as meaning "to remain in any one place with no apparent purpose" it did not. Consequently the Court held the ordinance unconstitutionally vague – "the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not." 527 U.S. at 57. The *Dost* factor six gloss on § 2256(2)(A)(v)'s text has resulted in a similar muddling of what Congress intended in proscribing depictions of minors engaging in "sexually explicit conduct."

present.[67] *Cf. United States v. Kemmerling*, 285 F.3d 644, 645-46 (8th Cir.), *cert. denied,* 537 U.S. 860 (2002) ("Mere nudity does not constitute the lascivious exhibition of the genitals or public area.").

In *United States v. Amirault*, 173 F.3d 28, 34 (1st Cir. 1999), the First Circuit characterized the sixth *Dost* factor as "the most confusing and contentious of the *Dost* factors." Responding to government argument that the focus of analysis should be on the "context surrounding the creation and acquisition" of a suspect photograph, the First Circuit stated:

> We have serious doubts that focusing upon the intent of the deviant photographer is any more objective than focusing upon a pedophile-viewer's reaction; in either case, a deviant's subjective response could turn innocuous images into pornography. Moreover, a focus on the photograph's use seems inconsistent with the statute's purpose of protecting the child. . . . **We agree with the Third Circuit that in determining whether there is an intent to elicit a sexual response, the focus should be on the objective criteria of the photograph's design.**

*Id*. at 34-35 (emphasis added).

The video depictions relied on by the government in its prosecution of Mr. Rockett, and presumably by the jury to convict him, display naked children – nothing more. Such depictions are not lascivious; hence, they cannot be used to sustain a finding as to whether Mr. Rockett created or intended to create depictions

---

[67] *See Osborne v. Ohio*, 495 U.S. 103, 113-14 (1990) (noting that the statute which the Court upheld "avoided penalizing persons for viewing or possessing innocuous photographs of naked children").

of minors engaged in "sexually explicit conduct" as required by § 2251(a). *Cf.* *Amirault*, 173 F.3d at 35 ("We believe the only truly striking aspects of the photograph to be the girl's nakedness and her youth. These factors alone are not enough to render the photo 'lascivious.'").

### D. The Doctrine Of Constitutional Avoidance Mandates An Objective Interpretation Of The "Lascivious Exhibition" Criterion.

In addition to constitutional vagueness, Mr. Rockett contends that the federal courts' embrace of the *Dost* factors has resulted in a violation of the separation of powers doctrine. The Constitution does not permit a legislature to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1876). Congress, not the courts, is the deliberative body that the Constitution has empowered to decide what conduct to prohibit. *See* U.S. Const. art I., § 1. In *Liparota v. United States*, 471 U.S. 419, 424 (1985), the Supreme Court declared: "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." The federal courts have no power to authorize and effectuate convictions for conduct that falls outside a statute's text, or to declare certain conduct criminal solely on the basis of common law principles. *See United States v. Hudson & Goodwin*, 11 U.S. 32, 34 (1812). But

this is exactly what has happened with the use of the non-statutory *Dost* factors to determine whether an image depicting a minor will be classified as a "Lascivious Exhibition."

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney Gen. v. Delaware & Hudson Co*., 213 U.S. 366, 408 (1909). This canon of "constitutional-doubt" should be employed here to scuttle use of the *Dost* factors, and in particular factor six, and return the focus of legal attention to the objective determination of whether a photographic depiction, considered within its four corners, contains a depiction of sexually explicit conduct by a minor. *Cf. United States v. Villard*, 885 F.2d 117, 122 (3d Cir. 1989) ("We must, therefore, look at the photograph, rather than the viewer. If we were to conclude that the photographs were lascivious merely because Villard found them sexually arousing, we would be engaging in conclusory bootstrapping rather than the task at hand—a legal analysis of the sufficiency of the evidence of lasciviousness.").

**V.     MR. ROCKETT'S CONVICTIONS UNDER COUNTS 4 AND 5 SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF A SUBSTANTIAL STEP TOWARD COMMITTING THE CRIME OF PRODUCING CHILD PORNOGRAPHY.**

**A.     Standard of Review.**

"A motion for Judgment of Acquittal is reviewed on a sufficiency-of-the-evidence standard." *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998). "Under that standard, evidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.*

**B.     The Evidence Is Insufficient To Establish That Mr. Rockett Attempted To Create Photographic Depictions Of Minors Engaged In Sexually Explicit Conduct.**

Counts 4 and 5 of the Second Superseding Indictment allege that Mr. Rockett attempted to produce child pornography in violation of §§ 2251(a) and (e). In order to prove him guilty of Attempting to Produce Child Pornography, the government was required to prove the following beyond a reasonable doubt:

1.     The victims identified in those counts [Count 4 – M.G.; Count 5 – H.J.] were under the age of eighteen years;

2.     The defendant intended to employ, use, persuade, induce, entice, or coerce those minors to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct;

3.  The defendant intended to produce the visual depictions of using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer; and

4.  The defendant did something that was a substantial step toward committing the crime. *See* Jury Instr. No. 21, ER 24-25.

A conviction for attempt requires the government to prove that the defendant intended to commit the offense [of Production of Child Pornography] *and* that the defendant did some act that was a substantial step toward committing that offense. *United States v. Buffington*, 815 F.2d 1292, 1301 (9th Cir. 1987). Mere intent alone is not sufficient to constitute an attempt to commit an offense. Rather, it must also be demonstrated that a "substantial step" was taken toward commission of the intended offense. "To constitute a substantial step, a defendant's 'actions must cross the line between preparation and attempt by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances." *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007); *see also United States v. McDowell,* 705 F.2d 426, 428 (11th Cir. 1983) ("[T]he defendant's acts, taken as a whole, must strongly corroborate the required culpability; they must not be equivocal.").

The statutory definition and judicial interpretation of "sexually explicit conduct" and "lascivious exhibition of the genitals or pubic area" have been

49

discussed above. In order to prove that Mr. Rockett's conduct, as portrayed by the evidence presented by the government, constituted a "substantial step" toward completing the criminal conduct charged against him, it was incumbent on the government to prove that the charged substantive crime would have taken place "unless interrupted by independent circumstances." Mere preparation is not enough.

The evidentiary bases for Mr. Rockett's conviction as to Counts 4 and 5 were the Facebook communications between him and Charis Jumoa-as, M.G.'s testimony, and the Facebook messages between M.G. and Mr. Rockett. Those Facebook communications were admitted into evidence as Government Exhibits 3 and 4. ER 78-124. Judge Simon gave a limiting instruction that Ms. Jumoa-as' statements were not to be considered for their truth, but as merely providing context to what Mr. Rockett was saying. RT 109.

Mr. Rockett never communicated with H.J., only with her mother, Charis-Jumoa-as. On various occasions, Mr. Rockett communicated via Facebook with Charis Jumoa-as requesting that Charis Jumoa-as take nude photographs of H.J. and M.G.. Gov't Ex. 4; ER 84-124.

M.G. knew Mr. Rockett only through Facebook. RT 246, 251-52. M.G. testified that Mr. Rockett wanted her and H.J. to take pictures of themselves without clothes on, but she did not respond to Mr. Rockett's request. RT 243, 247,

249. She further testified that Charis Jumoa-as took photographs of her and H.J., but offered conflicting testimony as to whether those photographs were with or without clothing. RT 249-50, 257-58. While under cross-examination, M.G. testified that no pictures of her were taken without her clothes on. RT 257. On re-direct, she stated that Charis Jumoa-as did take a photograph of her without her clothes on. RT 258.

"[I]n order for a defendant to be guilty of a criminal attempt, the objective acts performed, without any reliance on the accompanying mens rea, [must] mark the defendant's conduct as criminal in nature." *United States v. Oviedo*, 525 F.2d 881, 885 (5th Cir. 1976). The objective acts in this case are Mr. Rockett's requests of Charis Jumoa-as and M.G. to take nude photographs. With Charis Jumoa-as, Mr. Rockett uses the descriptors "nude," "special," "private," "no clothes," "no shy," etc. Nudity, however, is not the dividing line between innocuous photos and child pornography. Rather, as noted heretofore, there must be an effort to entice or compel the minor to engage in "sexually explicit conduct." No such effort is present in the Facebook communications contained in Government Exhibits 3 and 4. Given this circumstance, Counts 4 and 5 fail for insufficiency of the evidence.

## VI. MR. ROCKETT'S CONVICTIONS FOR PRODUCING CHILD PORNOGRAPHY OUTSIDE THE UNITED STATES (COUNT 1) AND FOR POSSESSION OF CHILD PORNOGRAPHY (COUNT 9) SHOULD BE VACATED DUE TO THE RISK OF PREJUDICIAL SPILL-OVER STEMMING FROM THE EVIDENCE ADMITTED IN SUPPORT OF COUNTS 4, 5, 7, AND 8.

### A. Standard Of Review.

An issue on appeal not raised before the district court is subject to plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 730-36 (1993). Plain error is invoked to prevent a miscarriage of justice or to preserve the integrity and the reputation of the judicial process. *Id.* at 736.

### B. The Composition Of Government Exhibit 10 Created A Risk Of Prejudicial Spill-Over.

In addition to the § 2251(a) counts involving M.G., H.J., D.S., and B.S., Counts 4, 5, 7, and 8, Mr. Rockett was also charged with engaging in the production of child pornography at a location outside the United States, in violation of 18 U.S.C. §§ 2251(c) and (e), Count 1, and with possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), Count 9. Section 2251(c) specifically employs the term "sexually explicit conduct" in the same way the term is used in § 2251(a). Section 2252A(a)(5)(B) incorporates the term "sexually explicit conduct" in defining the term "child pornography." See 18 U.S.C. § 2256(8).

If, following review of the contents of Government Exhibit 10, this Court finds that the video depictions of nude children contained therein do not constitute Lascivious Exhibitions per § 2256(2)(A)(v), the verdicts returned as to Counts 1 and 9 will be placed in question insofar as there is no principled way of determining which images the jury may have relied on, or been influenced by, in returning those verdicts. *Cf. Zant v. Stephens*, 462 U.S. 862, 881 (1983) ("[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground."). Should this circumstance arise, Mr. Rockett contends that the Court should vacate the verdicts entered against him and remand Counts 1 and 9 to the district court for a new trial.

## CONCLUSION

In light of the above, Mr. Rockett respectfully submits that his convictions under Counts 4, 5, 7, and 8 of the Second Superseding Indictment should be vacated. In addition, to the extent that this Court finds that the video depictions of nude children contained in Government's Exhibit 10, and in particular Government's Exhibit 10-15 through 10-23, prejudiced the jury's determination of the charges raised against Mr. Rockett in Counts 1 and 9, those counts should also be vacated.

Respectfully submitted this 17th day of May, 2017.

*/s/ Christopher J. Schatz*
Christopher J. Schatz
Assistant Federal Public Defender
*Attorney for Defendant-Appellant Rockett*

Amy Bruning
Legal Research Assistant

54

## STATEMENT OF RELATED CASES

I, Christopher J. Schatz, undersigned counsel of record for Defendant-Appellant Steven Douglas Rockett, state pursuant to the Ninth Circuit Court of Appeals Rule 28-2.6, that I know of no other cases that should be deemed related.

Respectfully submitted this 17th day of May, 2017.

*/s/ Christopher J. Schatz*
Christopher J. Schatz
Assistant Federal Public Defender
*Attorney for Defendant-Appellant Rockett*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13651 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 Times New Roman 14-point font.

Respectfully submitted this 17th day of May, 2017.


*/s/ Amy Bruning*
Amy Bruning

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 17th day of May, 2017.

*/s/ Amy Bruning*
Amy Bruning

# ADDENDUM

## 18 U.S.C. § 2251 – Sexual exploitation of children

(a)     Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

(b)     Any parent, legal guardian, or person having custody or control of a minor who knowingly permits such minor to engage in, or to assist any other person to engage in, sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct shall be punished as provided under subsection (e) of this section, if such parent, legal guardian, or person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

(c)

    (1)     Any person who, in a circumstance described in paragraph (2), employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct outside of the United States, its

territories or possessions, for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e).

(2)    The circumstance referred to in paragraph (1) is that—

    (A)    the person intends such visual depiction to be transported to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail; or

    (B)    the person transports such visual depiction to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail.

(d)

(1)    Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering—

    (A)    to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or

    (B)    participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct;

shall be punished as provided under subsection (e).

(2)    The circumstance referred to in paragraph (1) is that— (A) such person knows or has reason to know that such notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed; or (B) such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed.

(e)    Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than 15 years nor more than 30 years, but if such person has one prior conviction under this chapter, section 1591, chapter 71, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of

Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years, but if such person has 2 or more prior convictions under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 35 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for not less than 30 years or for life.

## 18 U.S.C. § 2256 – Definitions for chapter

For the purposes of this chapter, the term—

(1) "minor" means any person under the age of eighteen years;

(2)

 (A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or simulated—

  (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

  (ii) bestiality;

  (iii) masturbation;

  (iv) sadistic or masochistic abuse; or

  (v) lascivious exhibition of the genitals or pubic area of any person;

 (B) For purposes of subsection 8(B) 1 of this section, "sexually explicit conduct" means—

  (i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious

        simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;

    (ii)    graphic or lascivious simulated;

        (I)    bestiality;

        (II)    masturbation; or

        (III)    sadistic or masochistic abuse; or

    (iii)    graphic or simulated lascivious exhibition of the genitals or pubic area of any person;

(3)    "producing" means producing, directing, manufacturing, issuing, publishing, or advertising;

(4)    "organization" means a person other than an individual;

(5)    "visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format;

(6)    "computer" has the meaning given that term in section 1030 of this title;

(7)    "custody or control" includes temporary supervision over or responsibility for a minor whether legally or illegally obtained;

(8)    "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

    (A)    the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

    (B)    such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

    (C)    such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

(9)    "identifiable minor"—

    (A)    means a person—

    (i)

      (I) who was a minor at the time the visual depiction was created, adapted, or modified; or

      (II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and

    (ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and (B) shall not be construed to require proof of the actual identity of the identifiable minor.

(10) "graphic", when used with respect to a depiction of sexually explicit conduct, means that a viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted; and

(11) the term "indistinguishable" used with respect to a depiction, means virtually indistinguishable, in that the depiction is such that an ordinary person viewing the depiction would conclude that the depiction is of an actual minor engaged in sexually explicit conduct. This definition does not apply to depictions that are drawings, cartoons, sculptures, or paintings depicting minors or adults.